UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF TENNESSEE
SOUTHERN DIVISION

| | | |
|---|---|---|
| IN RE: CHAD EDWIN SPURGEON | * | BK# 07-10462 |
| | * | |
| DEBTOR(S) | * | CHAPTER 13 |

## DEBTOR'S BRIEF IN SUPPORT OF CONFIRMATION

Comes the Debtor, Chad Edwin Spurgeon, through counsel for his brief in support of confirmation. Debtor will establish the following two issues herein:

**1. The Plan must be confirmed over the objection of Alicia Lynn Jackson because the Debtor is in compliance with all provisions of the Domestic Support Order.**

**2. The Plan must be confirmed over the objection of the Trustee because the projected "disposable income" beginning on the date that the first payment was due under the plan rightfully contemplated secured monthly payments were deductible from CMI. Alternatively, special circumstances warrant confirmation.**

## FACTS

On February 2, 2007, Debtor filed this present Chapter 13 case. Among Debtor's creditors were Greentree AL, LLC, ("Greentree"), holding a secured claim on a mobile home in the amount of $25,891.38, and Debtor's former wife Alicia Lynn Jackson. The claim of Greentree reflects the original makers of the Retail Installment Contract were the debtor Chad E. Spurgeon and his then wife Lisa Spurgeon, who is known in this case as Alicia Lynn Jackson.

Debtor and Ms. Jackson had been divorced in Jackson County Alabama Circuit Court on January 3, 2003. Attached hereto as Exhibit 1, is the Final Decree of divorce which incorporates the marital dissolution Agreement. Nothing in the divorce decree creates a domestic support obligation recognizable under §523(a)(5) or §523(a)(15), as it pertains to the Greentree claim.

The Truth in Lending disclosure on Greentree's claim shows the Debtor and Ms. Jackson they were to pay 300 payments of $273.10 beginning with March 22, 1996, and monthly thereafter. Therefore there were approximately 168 monthly payments contractually remaining to be paid to Greentree after the date of filing the case, and at the time the Debtor's plan payments began. The wage order was issued February 6, 2007, for the Debtor to begin making his weekly plan payments.

The Debtor, because of his non-filing spouse's income, is above the median income. Therefore he was required to file the long-form B22C. The Debtor followed the instructions of the law and the form and included therein the payments to Greentree that are contractually due over the next 60 months. The form requires the Debtor to deduct from CMI the secured payments to be contractually due over the next 60 months, without reference to retention or surrender of the property.

This is the similar treatment due on the form whether the Debtor was filing a Chapter 7 or Chapter 13. The present payments of $341.42 are inclusive of an escrow payment. The bottom line is the Debtor has $2.65 per month available income at the end of Form B22C to be paid to unsecured creditors.

## DISCUSSION

### 1. The Plan must be confirmed over the objection of Alicia Lynn Jackson because the Debtor is in compliance with all provisions of the Domestic Support Order.

The divorce Final Decree does create a Domestic Support Obligation ("DSO") as defined in 11 U.S.C. §101(14A), to the extent it does provide for the debtor to pay current child support and to pay the Rhodes Furniture account. Beyond that there is no DSO pertaining to the Greentree obligation. In pertinent part a DSO is defined by BAPCPA as follows:

> The term "domestic support obligation" means a debt that accrues before, on, or after the date of the order for relief in a case under this title, including interest that accrues on that debt as provided under applicable nonbankruptcy law notwithstanding any other provision of this title, that is –
> (A) owed to or recoverable by –
>     (i)    a spouse, former spouse, or child of the debtor or such child's parent, legal guardian, or responsible relative; or
>     (ii)    a governmental unit;
> (B) in the nature of alimony, maintenance, or support (including assistance provided by a governmental unit) of such spouse, former spouse, or child of the debtor or such child's parent, without regard to whether such debt is expressly so designated;
> (C) established or subject to establishment before, on, or after the date of the order for relief in a case under this title, by reason of applicable provisions of --
>     (i)    a separation agreement, divorce decree, or property settlement agreement;
>     (ii)    an order of a court of record; or
>     (iii)    a determination made in accordance with applicable nonbankruptcy law by a governmental unit; and
> (D) not assigned to a nongovernmental entity....

11 U.S.C. §101(14A)

To prove there is a DSO these elements must be proved:

    (1)    a debt owed by claimant
    (2)    in the nature of support
    (3)    established or subject to establishment pre-or post-petition by reason of a separation

agreement, divorce decree, property settlement, or court order.

In re Deemer, 2007 WL 184744 (Bkrtcy, N.D. Iowa)

At the preliminary hearing on confirmation, Counsel for Ms. Jackson stipulated the duty for the debtor to pay the Greentree obligation was not a §523(a)(5) support obligation. Her Counsel argued it was a §523(a)(15) obligation; however, the Debtor contends it cannot be because the Agreement stated as follows:

### "2. Division of Personal Property

a.   The parties owns (sic) a 1996 16x80 mobile home. Said mobile home is financed with Green Tree Finance in the name of both parties. The Defendant shall be awarded this mobile home and shall be responsible for any indebtedness on same. The parties are building a home located immediately in front of said mobile home. The Defendant shall also be awarded the home which is under construction and shall be responsible for the same….."

The decree went on to say:

### "3. Marital Debts

a.   The parties are indebted to Americas Choice, formerly Rhodes Furniture. The Defendant shall be responsible for this debt and shall hold the Plaintiff harmless from the same.
b.   Each party shall be responsible for any debt which is listed solely in their name and shall be responsible for any debt he created since the date of separation."

The Agreement does make a DSO as it related to establishing child support, specifically as it relates to establishing child support, and as it relates to Rhodes Furniture. It did not establish a DSO as to Greentree because it did not "create" any new liability. Debtor was already responsible for the Greentree note, so to say that he was to continue to be obligated on it meant nothing but to restate the obvious. The court demonstrated that it knew how to create a §523(a)(15) claim when it did so in paragraph 3 related to Rhodes Furniture. When it chose not to do so on Greentree, it left Ms. Jackson merely as an unsecured creditor. Paragraph 2 never created a "hold harmless" or indemnification agreement. The Agreement was prepared by this creditor and as such should be construed against her.

**2. The Plan must be confirmed over the objection of the Trustee because the projected "disposable income" beginning on the date that the first payment was due under the plan rightfully contemplated secured monthly payments were deductible from CMI. Alternatively, special circumstances warrant confirmation.**

The Trustee objected to the Debtor's plan because the Debtor took the mandatory deduction from CMI required on Line 47 of the B22C as monthly payments on the secured debt to Greentree. The Trustee disputes this deduction on the grounds that the mobile home securing the debt has been or will be surrendered by the Debtor and no further payments will be made on such debt during the plan. The mobile home is owned by the Debtor and was cosigned by creditor Alicia Jackson. To the Debtor's knowledge, the mobile home has not yet been auctioned off but the stay has been lifted. The Debtor's plan proposes to surrender the mobile home.

Section 1325(b)(1) reads as follows:

> (b)(1) If the trustee or the holder of an allowed unsecured claim objects to the confirmation of the plan, then the court may not approve the plan unless, as of the effective date of the plan –
>
>> (A) the value of the property to be distributed under the plan on account of such claim is not less than the amount of such claim: or
>>
>> (B) the plan provides that all of the debtor's projected disposable income to be received in the applicable commitment period <u>beginning on the date that the first payment is due under the plan</u> will be applied to make payments to unsecured creditors under the plan.

(11 U.S.C. §1325(b)(1) (emphasis added))

The phrase "projected disposable income" was in the bankruptcy code prior to BAPCPA, however, that phrase was not defined. It still is not but the phrase "disposable income" is now defined in section 1325(b)(2). As defined, "disposable income" is "current monthly income" (as that term is defined in §101(10A)), less various exclusions set forth in section 1325(b)(2), and less "amounts reasonably necessary to be expended" for the maintenance or support of the debtor or a dependent of the debtor or for post-petition domestic support obligations and charitable deductions. Those amounts reasonably necessary to be expended are set forth in section 1325(b)(3).

The income side of that definition is not in dispute in the present case. The difficulty is whether the debtor may exclude from the CMI the mandatory deductions of section 707(b)(2)(A), which has been incorporated into §1325(b)(3) and which is part of section §1325(b)(2).

## <u>Legislative History of BAPCPA §1325(b)(2)</u>

The present version of §1325(b)(2) was not originally part of BAPCPA. It was originally part of Amendment Number 94, offered by Senator Russ Feingold of Wisconsin. Together with Amendment 97, Senator Feingold attempted to reshape Chapter 13 practice of the Means Test to have it mirror Chapter 7. His Amendment 94 was not approved by the Senate (attached for the court's

convenience), but it was ultimately the verbatim adaptation that emerged out of conference as the final version of section 1325(b)(2).

Also attached hereto are excerpts from the Congressional Record Statement of Senator Russ Feingold. In Senator Feingold's own words, Amendment 94 (which became law) changed section 1325(b)(2) so that he corrected a "drafting error" " to require debtors with income over the median income to use the IRS standards contained in the means test to determine their allowable living expenses…" (http://feingold.senate.gov/statements/05/03/2005418655.html) (see attached).

After all, the entire concept of using the IRS standards is to consider what would the IRS consider in working out an offer of compromise and/or use to set up an installment payment agreement. In those cases the IRS would be looking at the debtor's prospective debt service at the time of the offer of compromise or installment agreement. There was a retroactive, historical view of the debtor's expenses and then an endeavor to bring that payment forward to calculate the installment agreement or accept the offer in compromise. In Senator Feingold's own words, his intention in introducing Amendment 94 was to bring parity to Chapter 13 that was found in Chapter 7: Use the means test which is available in Chapter 7, in Chapter 13.

It makes no public policy sense to allow the deduction for secured payments to be deducted from CMI in Chapter 7 but not in Chapter 13. The cases already largely allow the deduction for surrendered secured creditor payments to be deducted from Chapter 7. Yet some cases are not allowing the same deduction in Chapter 13. These cases overlook the legislative history discussed above that establishes that §1325(b)(2) was inserted precisely for that reason. The cases that disallow the monthly payments on secured debts from being deducted on Line 47 of form B22C get there by flawed reasoning.

For example, the Trustee relies upon In re Crittendon. Slip Copy 2006 WL 2547102 (Bkrtcy. M.D.N.C.) for the proposition that prospective payments on surrendered secured creditors may not be included on Line 47 of Form B22C. The Trustee's reliance on Crittendon is beneficial to the debtor because Crittendon relied upon the clause found in §1325(b)(1), that the plan must provide "as of the effective date of the plan", that the "projected disposable income" must be paid into the plan. We shall see the operative date to do the calculation is not the effective date of the plan, it is "the date that the first payment is due under the plan" described in §1325(b)(1)(B).

Let's evaluate the Crittendon analysis and see where the analysis broke down. It neglected to consider the "due" date of §1325(b)(1)(B). The court wrote:

> It is the position of the Debtors that since they had secured debts owing to all of the creditors listed on line 47 of the B22C when this case was filed, the payments listed on line 47 were "scheduled as contractually due to secured creditors" as described in section 707(b)(2)(A)(iii) and therefore were properly included as deductions in arriving at their "monthly disposable income" on line 58 of their Form B22C. The Debtors argue that section

1325 (b)(2)(A)(iii), in plain language, specifically allows a deduction for "the total of all amounts scheduled as contractually due to secured creditors" and does not condition such calculation on whether the collateral is retained by the debtors after the case is commenced. According to the Debtors, the means test contained in section 707(b)(2) is a "backward looking test" which is designed to measure the debtor's financial condition at the time the debtor is in need of bankruptcy relief. On that basis, the Debtors concluded that a surrender of collateral after the commencement of the case is inconsequential.

Debtors' argument may be correct in the context of a chapter 7 case in which the court is called upon to determine whether the granting of relief would be an abuse of the provisions of chapter 7. In that context, the application of the provisions of section 707(b)(2) involves a snapshot evaluation of the debtor's financial condition on the petition date such that a surrender of collateral arguably may be irrelevant and inconsequential. However, the situation presented by a section 1325(b) objection in a chapter 13 case is materially different because the timing of the application of section 707(b)(2)(A) and (B) is different in the chapter 13 case.

The first sentence of section 1325(b)(1) contains the language "as of the effective date of the plan." This language was a part of section 1325(b) prior to the enactment of BAPCPA and was left in place when BAPCPA was enacted. It is a settled rule of statutory interpretation "that a statute must, if possible, be construed in such fashion that every word has some operative effect." *United States v. Nordic Village, Inc.*, 503 U.S. 30, 36, 112 S. Ct. 1011, 1015, 117 L. Ed. 2d 181 (1992). In this case, it is possible to give operative effect to " as of the effective date of the plan" and the court, therefore, must do so.

This "as of the effective date of the plan" language as used in section 1325(b)(1) is followed by both subparagraph (A) and subparagraph (B) of section 1325(b)(1). Given this arrangement of the statutory language, the plain meaning of the statute is that both subparagraph (A) and subparagraph (B) are modified by the "as of the effective date of the plan" language in section 1325(b)(1) and such language therefore is applicable to both subparagraphs. This means that the determination called for under section 1325(b)(2)(B) depends upon whether *as of the effective date of the plan* the plan commits all of the debtor's projected disposable income to make payments to unsecured creditors. In order to make this determination, the court must determine the "disposable income" of the debtor as of the effective date of the plan which generally is regarded as the date of confirmation. *See In re Solomon*, 67 F. 3d 1128, 1132 (4th Cir. 2995) (sic) ("Projected disposable income typically is calculated by multiplying the monthly income *at the time of confirmation* by 36 months ... then determining the portion of the income which is disposable according to the statutory definition." Emphasis supplied). FN3. Accordingly, "disposable income" will be determined in this case by applying section 707(b)(2)(A) and (B) according to the pertinent circumstances existing on the date of the confirmation hearing, rather than on the basis of the circumstances existing on the petition date.

On first blush this analysis seems persuasive, and in fact this type of analysis has been followed by other courts. Debtor respectfully disagrees with those other courts. This reading obviously disregards Senator Feingold's language, and his motive to introduce Amendment 94, and it overlooks the "plain meaning" of the remaining parts of the statute.

What Crittendon and all the courts overlook in their dissection of 1325(b) is that there is not one but there are two critical dates that must be used to apply the means test. Crittendon and other cases correctly use the "effective date of the plan" as the date that they are to apply the test; what they overlook is the plain language in the statute for the much earlier test date for when the test is to be calculated.

The statute tells us unambiguously that we do the calculations "beginning on the date the first payment is due under the plan..." (§1325(b)(1)(B)).

We know that §1326(a)(1) tells us the Debtor must begin Chapter 13 plan payments within 30 days of the Order of relief or upon court order, whichever is earlier. This funding requirement happens long before either confirmation or the effective date of the plan. Yet that moment the plan payments begin is the first time moment that occurs in the life history of the case that is relevant to calculating the projected disposable income. After any Debtor files, thereafter the duty to fund the plan occurs under §1326(a) begins and simultaneously a calculation is to be made as of that instant. As of the moment the wage order is issued the debtor is to pay "projected disposable income to be received in the applicable commitment period beginning on the date the first payment is due under the plan" (§1325(b)(1)(B)). Some time later is the confirmation of the plan and with it, either contemporaneously or thereafter, is a duty to pay that projected "disposable income" as of "the date the first payment is due under the plan" (§1325(b)(1)).

Since the first test date of §1325(b)(1)(B) is the §1326(a) moment of plan funding, the remaining question is what payments would be contractually due as of the plan funding date? Contractually due payments under §707(b)(2)(A) must be deducted from the amounts reasonably necessary to be expended found in §1325(b)(3). In this case the payments to Greentree were due as of the date of filing, February 2, 2007. The court ordered the debtor to commence making payments on February 6, 2007, by virtue of the wage order entered. Therefore as of February 6, 2007, §1325(b)(1)(B), the plan payment commencement date, was the moment to calculate what should be allowed in the "projected disposable income" calculation set forth therein. This was a pre-confirmation date.

As of the date of the wage order the secured creditor payments to Greentree were contractually scheduled to be forecast into the future under §707(b)(2)(A). Not until April 5, 2007, was the stay lifted but even then the payments were still due. As of this writing, we have no notice the mobile home has been foreclosed; the payments are still due, and hypothetically, the creditor could elect not to foreclose and the payments would still be contractually due. Upon confirmation, we will

have an effective date of the plan. And as the effective date we will look back to February 6, 2007, the date of the wage order, to see what secured creditors' claims were contractually due to be paid at that time.

It is only by this type of analysis that we can give full weight to the mandatory requirements of §1325(b)(3) that "amounts reasonably necessary to be expended under paragraph (2) shall be determined in accordance with subparagraphs (A) and (B) of section 707(b)(2)..." (11 U.S.C. §1325(b)(3)). And it is with this type of analysis the public policy basis for Amendment 94 can be effectuated. The policy of bringing the Chapter 7 means test to Chapter 13 makes sense. It facilitates the rehabilitation for the honest but unfortunate debtor, and it does not penalize the debtor who needs Chapter 13.

Under section 1325(b)(3) the amounts reasonably necessary to be expended must be calculated under §707(b)(2)(A) and (B). In §707(b)(2)(B)(i), the Debtor is afforded the opportunity to establish "special circumstances...to the extent that such special circumstances justify additional expenses or adjustments of current monthly income." That proof should be determined at a hearing if necessary for confirmation. Nothing in §707(b)(2)(B)(ii) requires that proof to be offered ahead of the hearing. Therefore unless the Debtor prevails on the merits, the Debtor requests a hearing to establish special circumstances in support of confirmation.

Respectfully Submitted:

KENNETH C. RANNICK

/s/ Kenneth C. Rannick
Attorney for Debtors, #11106
4416 Brainerd Road
Chattanooga, TN 37411
423/624-4002 telephone
423/624-0509 facsimile
rannick@lawyerchattanooga.com e-mail

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a true and exact copy of the foregoing has been served upon the parties listed below electronically or by placing the same in the United States Mail with sufficient postage thereupon to carry it to its destination, dated May 7, 2007.

/s/ Kenneth C. Rannick
Kenneth C. Rannick

James M. Setters
Attorney for Chapter 13 Trustee

Kyle Weems
Attorney for Alicia Jackson

## IN THE CIRCUIT COURT OF JACKSON COUNTY, ALABAMA

ALICIA LYNN SPURGEON     )
                      )
     Plaintiff           )
                      )
V.                    )     Case No: DR-2005- *555*
                      )
CHAD EDWIN SPURGEON    )
                      )
     Defendant       )

### FINAL DECREE

     This cause, coming on to be heard, was submitted for final decree upon the pleadings and proof as noted and, from and after consideration thereof, it is ORDERED, ADJUDGED AND DECREED by the Court as follows:

     1.     That the bonds of matrimony heretofore existing between the Plaintiff and the Defendant be, and the same hereby are, dissolved and ALICIA LYNN SPURGEON is forever divorced from CHAD EDWIN SPURGEON for and on account of incompatibility.

     2.     That neither the Plaintiff nor the Defendant shall again marry, except to each other, until sixty (60) days after the date of this decree and, if an appeal is taken neither the Plaintiff nor the Defendant shall again marry, except to each other, during the pendency of said appeal. Such appeal must be instituted within forty-two (42) days from this decree or from the date that the post-trial motion is denied.

     3.     That the agreement entered into by the Plaintiff and the Defendant is hereby ratified and adopted and made a part of the final decree of divorce.

     4.     Alabama law requires each party in this action who has either custody of or the right of visitation with a child to notify other parties who have custody of or the right of visitation with the child of any change in his or her address or telephone number, or both, and of any change or proposed change of principal residence and telephone

Exhibit 1

number or numbers of a child. This is a continuing duty and remains in effect as to each child subject to the custody or visitation provisions of this decree until such child reaches the age of majority or becomes emancipated and for so long as you are entitled to custody of or visitation with a child covered by this order. If there is to be a change of principal residence by you or by a child subject to the custody or visitation provisions of this order, you must provide the following information to each other person who has custody or visitation rights under this decree as follows:

  A.  The intended new residence, including the specific street address, if known.

  B.  The mailing address, if not the same as the street address.

  C.  The telephone number or numbers at such residence, if known.

  D.  If applicable, the name, address, and telephone number of the school to be attended by the child, if known.

  E.  The date of the intended change of principal residence of a child.

  F.  A statement of the specific reasons for the proposed change of principal residence of a child, if applicable.

  G.  A proposal for a revised schedule of custody of or visitation with a child, if any.

  H.  Unless you are a member of the Armed Forces of the United States of America and are being transferred or relocated pursuant to a non-voluntary order of the government, a warning to the non-relocating person that an objection to the relocation must be made within 30 days of receipt of the notice or the relocation will be permitted.

  You must give notice by certified mail of the proposed change of principal residence on or before the 45th day before a proposed change of principal residence. If you do not know and cannot reasonably become aware of such information in sufficient time to provide a 45-day notice, you must give such notice by certified mail not later than the 10th day after the date that you obtained such information.

Your failure to notify other parties entitled to notice of your intent to change the principal residence of a child may be taken into account in a modification of the custody of or visitation with the child.

If you, as the non-relocating party, do not commence an action seeking a temporary or permanent order to prevent the change of principal residence of a child within 30 days after receipt of the child, the change of principal residence is authorized.

5.      That the parties are mutually restrained from harassing, molesting, annoying, intimidating or otherwise bothering the other party or the other party's family.

6.      Any law enforcement officer within the jurisdiction of the Jackson County, Alabama Courts is hereby directed to assist the parties in enforcing the final decree of divorce.

Done this the ___3rd___ day of ___January___, 2006

_____
Circuit Judge

_____

I, Ken Ferrell, Clerk of the Circuit Court of Jackson County, Alabama, do hereby certify that the foregoing is a correct copy of the original decree rendered by the Judge of the Circuit Court in the above-stated cause, which said decree is on file and enrolled in my office and the cost in this case has been paid.

Witness my hand and seal, on this _____ day of _____, 2005.


_____
Circuit Clerk

## IN THE CIRCUIT COURT OF JACKSON COUNTY, ALABAMA

ALICIA LYNN SPURGEON )
)
    Plaintiff )
)
V. )   Case No: DR-2005- 555
)
CHAD EDWIN SPURGEON )
)
    Defendant )

### AGREEMENT

This agreement is made and entered into by and between Alicia Lynn Spurgeon, hereinafter called Plaintiff, and Chad Edwin Spurgeon, hereinafter called Defendant. The parties are now separated and agree that this agreement shall remain in full force and effect during their separation. In the event of a divorce, it is understood and agreed that this agreement will be incorporated into any final decree of divorce and be binding on the parties concerning child custody, child support, property settlement, and any other matters contained herein. Now therefore, the parties agree as follows:

1.     <u>DIVISION OF REAL PROPERTY</u>

The parties own no joint real property.

2.     <u>DIVISION OF PERSONAL PROPERTY</u>

a.     The parties owns a 1996 16 x 80 mobile home. Said mobile home is financed with Green Tree Finance in the name of both parties. The Defendant shall be awarded this mobile home and shall be responsible for any indebtedness on the same. The parties are building a home located immediately in front of said mobile home. The Defendant shall also be awarded the home which is under construction and shall be responsible for the same.

b.    The parties own a 2002 Nissan Extera which is listed in the name of the Defendant but is the primary vehicle of the Plaintiff. The Plaintiff shall be awarded this vehicle and shall be responsible for the indebtedness on the same.

c.    The Defendant owns a 1989 Ford F-150 truck. The Defendant shall be awarded this automobile and shall be responsible for the same.

d.    The Defendant owns a motorcycle and a 4-wheeler. He shall be awarded these recreational vehicles and shall be responsible for the same.

e.    All personal property shall be equitably divided by the parties.

3.    MARITAL DEBTS

a.    The parties are indebted to America's Choice, formerly Rhode's Furniture. The Defendant shall be responsible for this debt and shall hold the Plaintiff harmless from the same.

b.    Each party shall be responsible for any debt which is listed solely in their name and shall be responsible for any debt they created since the date of separation.

4.    CHILD CUSTODY/VISITATION

The parties shall exercise joint custody of the minor children of the parties, Madison Nichole Spurgeon, DOB 09-28-1996 and Brody Alexander Spurgeon, DOB 02-22-2003, with the Plaintiff to have primary physical care, custody and control of said minor children. The Defendant shall be entitled to visitation with the minor children as follows:



### STANDARD VISITATION FOR CHILDREN

1) Every other weekend from 5:00 p.m. on Friday until 5:00 p.m. on Sunday during the months of January through November of each year.

2) The second weekend in December of each year from 5:00 p.m. on Friday until 5:00 p.m. on the following Sunday.

3) Each Christmas Day from 3:00 p.m. until 3:00 p.m. on the following New Year's day in odd-numbered years; each December 18th from 3:00 p.m. until 3:00 p.m. on the following Christmas Day in even-numbered years.

4) One week during the month of June, to be selected by the non-custodial parent but upon written notice to the custodial parent at least 30 days in advance of such visitation; two weeks during the month of July, to be selected by the non-custodial parent but upon written notice to the custodial parent at least 30 days in advance of such visitation.

5) During the odd years, Spring Break (A.E.A.) vacation from 9:00 a.m. Saturday until the following Saturday at 6:00 p.m.

6) During the even years, Thanksgiving vacation from 4:00 p.m. Wednesday until Thanksgiving Day at 4:00 p.m.; during the odd years, Thanksgiving vacation from Thanksgiving Day at 4:00 p.m. until Friday at 4:00 p.m.

7) Every birthday of the child from 6:30 p.m. on said date until 8:00 a.m. the following day or until the start of the school day if the child is in school.

8) The Father shall have the child for every Father's Day from 6:00 p.m. on the preceding Saturday evening until 6:00 p.m. of Father's Day; the Mother shall have the child for every Mother's Day from 6:00 p.m. on the preceding Saturday evening until 6:00 p.m. of Mother's Day.

9) On the birthday of the non-custodial parent, from 3:00 p.m. on said date until 8:00 p.m. of the same day.

10) At such other, further or different times as may be agreed upon in advance between the parties.

Each parent shall keep the other informed on a current basis as to the primary residence address and telephone number where the children reside.

5.    CHILD SUPPORT

a.    The Defendant shall pay the sum of $150.00 per week as child support for the care and maintenance of the minor children of the parties.  Said child support payments shall be made by income withholding order, which shall be entered immediately in this cause.  Said child support amount is in compliance with Rule 32 of the Alabama Rules of Judicial Administration.

b.    The Defendant shall maintain medical insurance for the benefit of the minor children and the parties shall equally divide any unpaid medical, dental, optometric, pharmaceutical, or other health related expense not paid by insurance.

c.    The Plaintiff shall be allowed to claim the minor children for income tax purposes in even numbered years and the Defendant shall be allowed to claim the minor children for income tax purposes in odd numbered years.

d.    The Defendant shall maintain a life insurance policy insuring his life with a payout in the amount of $50,000.00.  The minor children shall be listed as beneficiaries on said policy.

e.    The issue of post-secondary education expenses shall be reserved for later ruling by this Court.

6.    ALIMONY

Neither the Defendant nor the Plaintiff shall receive any alimony.

7. OTHER

The Plaintiff shall be awarded her 401(k) or other retirement plan and the Defendant shall be awarded his 401(k) and/or other retirement plan. Each party shall

execute all documents necessary to effectuate the terms of this agreement should the

execution of such documents be necessary.

Done this the _____Nov_____ day of _____2_____, 20053.


_____          _____
Witness                                                     Plaintiff


_____          _____
Witness                                                     Defendant

| Next Hit | Forward | Next Document | New CR Search |
|---|---|---|---|
| Prev Hit | Back | Prev Document | HomePage |
| Hit List | Best Sections | Daily Digest | Help |
| | Contents Display | | |

## BANKRUPTCY ABUSE PREVENTION AND CONSUMER PROTECTION ACT OF 2005 - - (Senate - March 07, 2005)

` ` `If you decide to seek bankruptcy relief, you can represent yourself, you can hire an attorney to represent you, or you can get

[Page: S2137]   *GPO's PDF*

help in some localities from a bankruptcy petition preparer who is not an attorney. THE LAW REQUIRES A BANKRUPTCY PETITION PREPARER TO GIVE YOU A WRITTEN CONTRACT SPECIFYING WHAT THE BANKRUPTCY PETITION PREPARER WILL DO FOR YOU AND HOW MUCH IT WILL COST. Ask to see the contract before you hire anyone.' ''

AMENDMENT NO. 94
        (Purpose: To clarify the application of the term disposable income)

   Beginning on page 24, strike line 9 and all that follows through page 26, line 7, and insert the following:

   (h) **APPLICABILITY OF MEANS TEST TO CHAPTER** 13.--Section 1325(b) of title 11, United States Code, is amended by striking paragraph (2) and inserting the following:

   ` `(2) For purposes of this subsection, the term `disposable income' means current monthly income received by the debtor (other than child support payments, foster care payments, or disability payments for a dependent child made in accordance with applicable nonbankruptcy law to the extent reasonably necessary to be expended for such child) less amounts reasonably necessary to be expended--

   ` `(A)(i) for the maintenance or support of the debtor or a dependent of the debtor, or for a domestic support obligation, that first becomes payable after the date the petition is filed; and

   ` `(ii) for charitable contributions (that meet the definition of `charitable contribution' under section 548(d)(3) to a qualified religious or charitable entity or organization (as defined in section 548(d)(4)) in an amount not to exceed 15 percent of gross income of the debtor for the year in which the contributions are made; and

   ` `(B) if the debtor is engaged in business, for the payment of expenditures necessary for the continuation, preservation, and operation of such business.

   ` `(3) Amounts reasonably necessary to be expended under paragraph (2)(A)(i), shall be determined in accordance with subparagraphs (A) and (B) of section 707(b)(2), if the

debtor has current monthly income, when multiplied by 12, greater than--

    ``(A) in the case of a debtor in a household of 1 person, the median family income of the applicable State for 1 earner;

    ``(B) in the case of a debtor in a household of 2, 3, or 4 individuals, the highest median family income of the applicable State for a family of the same number or fewer individuals; or

    ``(C) in the case of a debtor in a household exceeding 4 individuals, the highest median family income of the applicable State for a family of 4 or fewer individuals, plus $525 per month for each individual in excess of 4.''.

Congressional Record Statement of Senator Russ Feingold's Amendments to the Bankrup...    Page 1 of 1

The next amendment also deals with chapter 13. It is amendment No. 94, and would correct a serious drafting error in section 102(h) of the bill that threatens to unintentionally eviscerate chapter 13. Refusing to remedy this error would be disastrous for the very chapter of the code that the sponsors of this bill want to encourage people to use.

In chapter 13 cases, debtors must devote all they can afford--that is, their disposable income after living expenses--to payments under their plan. These payments go to administrative expenses, secured creditors and unsecured creditors. In fact, most chapter 13 cases filed under current law are filed in order to deal with secured debts, to prevent foreclosure on a home or repossession of a car.

As written, section 102(h) of this bill would instead require that for debtors who are below median income, all disposable income must go to unsecured creditors, and none could be used for secured debts or administrative expenses. This is an obvious drafting error, since the purpose of section 102(h), as I understand it, was simply to require debtors with income over the median income to use the IRS standards contained in the means test to determine their allowable living expenses but to leave the law unchanged for debtors below median income.

If this error is not corrected, the bill will make it impossible for debtors below median income to use chapter 13. Now some in this body may be under the mistaken impression that people who file for chapter 13 bankruptcy are well off and they will only choose that chapter if they are forced to by this bill. That is obviously not true since chapter 13 exists now and millions of people use it voluntarily. The large majority of chapter 13 filers are actually below median income. In fact, in the 1980s, one study found that about 15 percent of chapter 13 filers were actually below the poverty line. Very few people file in chapter 13 because they have large amounts they can afford to pay to unsecured creditors. They do it to protect their homes from foreclosure or their cars from repossession. While there certainly are exceptions, people who file for bankruptcy are generally poor, whether they choose chapter 7 or chapter 13.

Currently, with no means test in place, about 30 percent of bankruptcy debtors voluntarily file under chapter 13. Even the sponsors of this bill claim that only another 8-10 percent of those who now file under chapter 7 would be switched to chapter 13 if the means test were implemented. So even with the means test, the majority of chapter 13 debtors will almost certainly be below median income. That means the drafting error I have discussed is a big deal. We have to fix this problem before it becomes law.

Section 318 requires debtors in chapter 13 whose current monthly income is over the median to file a 5-year plan rather than a 3-year plan. Requiring debtors to file a 5-year plan means it will take them longer to get back on their feet and they will end up paying more money to emerge from bankruptcy. Only those with a higher income should be subjected to this longer plan. But because of the way the income threshold is calculated in the bill, there is a great possibility of arbitrary and unfair results.

Whether this requirement applies depends on the income that debtors earn in the 6 months before bankruptcy rather than their actual income at the time of filing. In other words, the median income test is based on what you used to make, not what you make at the time of bankruptcy. To understand this problem, imagine person A has an income of $60,000 and that the State's median income is $45,000. A month before bankruptcy, she loses her job and is forced to take a job that pays only $30,000. Under the bill, her current monthly income works out to $5,000, even though she only makes $30,000 at the time of the bankruptcy and even if she never finds a higher paying job. So she would be forced into a 5-year plan, even though her real income is well below the threshold the bill's drafters apparently had in mind.

Imagine person B has an income of $40,000 before and after filing for bankruptcy. Because person B's income is below the median, she will be allowed to enter a 3-year plan even though she actually makes more than person A. So the definition of current monthly income as the average of the prior 6 months' income may not make sense in some cases.

My amendments provide two alternative ways to allow for a different and more accurate monthly income to be calculated. In addition, under my amendment, if a debtor's income decreases during the bankruptcy case to less than the median income, then a debtor who is at that time on a 5-year plan can seek to have the plan reduced to a 3-year plan.

Incidentally, the bill already provides a safety valve for calculating current monthly income in chapter 7. The court can reduce the income used for the means test if special circumstances are present. Special circumstances such as job loss or a sharp reduction in income from a home business would certainly qualify. I think it is an oversight that this was not done for chapter 13. So I hope the sponsors will simply fix this problem.

This change also needs to be made in another section of the bill where current monthly income plays a significant role: that is, in determining whether a debtor will have to use the restrictive IRS standards under the means test to figure out what living expenses will be permitted.

Again, it is unfair to someone filing in chapter 13 to make that determination based on past income rather than what the person actually makes. This is a commonsense fix. We shouldn't import the means test to chapter 13 without allowing for special circumstances adjustments to income. Either of my amendments would bring chapter 13 in line with chapter 7 on this score.

## Congressional Record Statement of Senator Russ Feingold's
## Amendments to the Bankruptcy Reform bill

March 9, 2005

Mr. FEINGOLD. Mr. President, I would like to have the attention of the Senate to
discuss my remaining amendments to the bankruptcy bill. I think my colleagues are
aware that I strongly oppose this bill and that I am very disappointed in the process
that has brought us to this point. I do not believe the sponsors of this bill and its
supporters in the other body have dealt fairly with the proposed amendments.

I understand the Senator from Utah came to the floor earlier in the day and was
complaining that I had a number of amendments and that I did not intend to vote for
the bill.

I have been a legislator for 22 years. This is not an auction. Even if you are going to
vote against a bill, if you have an amendment you believe will make it a better bill, it
is still a worthy consideration. I was told in the committee, where I wanted to offer
many of these amendments, that I should not offer them, that I should wait until the
bill came to the floor to offer the amendments. So in most cases that is exactly what
I did, being assured there would be a good faith response and consideration of the
amendments. Well, of course, that is not what has happened to date. And I
categorically reject the idea that simply because you do not think a bill is good, you
do not have a proper role on the floor of the Senate in trying to improve it.

This has not been a legislative process worthy of the Senate. Members of the
Judiciary Committee, as I just said, were implored to save their amendments for the
floor. Then, when we got here, we were told no amendments could be accepted. It
was a classic bait and switch. Negotiations have been minimal and pro forma.
Extremely reasonable amendments were rejected supposedly because they were not
drafted correctly, according to the sponsors, but there was no willingness to work on
the language of the amendments so they could become acceptable.